**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TERESA LYNN ELLIS,**

      **Plaintiff,**

**v.**                           **Case No.: 2:14-cv-21419**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 12 & 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the

presiding District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   <u>Procedural History</u>

On July 8, 2010, Plaintiff Teresa Lynn Ellis ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of August 31, 2009, (Tr. at 240, 245), due to "neck injury, back injury, anxiety attacks, spine deterioration in lower back, [and] cervical spine injury."[1] (Tr. at 333). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration.[2] (Tr. at 92-96, 111-16, 123-26, 134-36). Claimant filed a request for an administrative hearing, (Tr. at 137), which was initially held on June 25, 2012 before the Honorable Rebecca B. Sartor, Administrative Law Judge. (Tr. at 79-83). Without receiving any testimony, Judge Sartor found that additional evidence was necessary and rescheduled the hearing. (Tr. at 81-82). The hearing reconvened on September 25, 2012 before the Honorable Sabrina Tilley, Administrative Law Judge ("ALJ"). (Tr. at 50-78). During the course of the hearing, Judge Tilley determined that updated consultative evaluations would be necessary in assessing Claimant's medical conditions, and she continued the hearing. (Tr. at 64, 77-78). The third administrative hearing was held by the ALJ on January 23, 2013. (Tr. at

---

[1] In a Disability Report completed by Claimant, she indicated becoming disabled on March 18, 2010, as a result injuries sustained in a motor vehicle accident. (Tr. at 333). In her brief requesting judgment on the pleadings, Claimant asserts that she intended her disability onset date to coincide with the date of the motor vehicle accident. (ECF No. 12 at 2 n.1).

[2] Claimant previously applied for benefits in October 2005 under the name Teresa L. Holbrook. (Tr. at 14, 284). Her applications were denied initially and at the reconsideration level in May 2006. The denials apparently were not appealed. (Tr. at 14, 103-10).

37-49). By written decision dated March 5, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14-24). The ALJ's decision became the final decision of the Commissioner on May 30, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Claim, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a reply memorandum, (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 38 years old at the time of her amended alleged disability onset date of March 18, 2010, and 41 years old on the date of the ALJ's decision. (Tr. at 24, 240, 245, 333). She is a high school graduate and communicates in English. (Tr. at 332, 334). Claimant has previously worked as an office assistant, production worker at a pharmaceutical company, cook at a fast food restaurant, cashier at a gas station and retail store, fork lift operator, and manager of a gas station. (Tr. at 334, 354-60).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining

physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and

degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2013. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 31, 2009, the alleged onset date. (Tr. at 17, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical spine, obesity, pain disorder, depressive disorder, and panic disorder." (Tr. at 17, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of migraine headaches, dizziness, and carpal tunnel syndrome. (Tr. at 17). However, the ALJ determined that these alleged impairments did not cause more than a minimal limitation in Claimant's abilities to perform basic work activities. (*Id.*)

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the

impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally climb, balance, stoop, kneel, crouch, or crawl. She should avoid concentrated exposure to extreme cold, vibrations, and hazards. She would be further limited to simple, routine, and repetitive tasks with only occasional interaction with coworkers and supervisors, and no interaction with the general public. She could make only simple work-related decisions in an environment requiring no fast-paced production requirements, and few, if any changes in work routine.

 (Tr. at 18-22, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1972, and was defined as a younger individual on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a grader sorter, price marker, or assembler at the light exertional level, and as a hand packer, bench worker, or price marker at the sedentary exertional level. (Tr. at 22-23, Finding No. 10). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 23-24, Finding No. 11).

**IV.**   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, Claimant insists that the ALJ failed to properly consider the opinions of examining physicians Leandro Galang, M.D., and Rakesh Wahi, M.D., when formulating Claimant's RFC. (ECF No. 12 at 11). Claimant points out that in order to carry out a full range of light work, a person must be able to perform a "good deal of walking or standing" and lift up to twenty pounds at a time. (*Id.*) Claimant insists that she is unable to perform light work given the functional limitations found by Dr. Galang and Dr. Wahi. (*Id.* at 11-15). Claimant emphasizes Dr. Galang's May 2010 finding that she had limitations in standing, walking, and sitting for prolonged periods of time due to cervical and lumbar strain, disc herniation, and degenerative disc disease. (*Id.* at 14). Claimant insists that the ALJ rejected Dr. Galang's opinion as to these limitations for improper or factually unsupported reasons. (*Id.* at 14-15). Moreover, as additional support for Claimant's argument that she cannot perform light work, she cites Dr. Wahi's opinion that Claimant could only sit for four hours and stand or walk for one hour in an eight-hour workday. (*Id.* at 12). Claimant also points out that Dr. Wahi opined she could occasionally lift and carry a maximum of ten pounds and never stoop, kneel, crouch, or crawl. (*Id.*) Claimant asserts that the ALJ failed to discuss Dr. Wahi's opinion as to Claimant's functional limitations, and consequently, neglected to acknowledge that the RFC finding conflicted with Dr. Wahi's opinion. (*Id.*) Claimant argues that she was prejudiced by the ALJ's alleged failure to discuss Dr. Wahi's opinion, and in support of her argument, she points out that the vocational expert testified at the administrative hearing that an individual limited to four hours of sitting and one hour of standing or walking would not be able to perform substantial gainful employment on a full-time

basis. (*Id.* at 12-13). In her second challenge, Claimant contends that the ALJ's written decision contained inconsistent findings concerning Claimant's credibility. (*Id.* at 16). According to Claimant, the ALJ made contradictory statements in her decision, in one instance noting that Claimant's statements concerning her symptoms were not entirely credible, and in another instance stating that Claimant's complaints regarding her impairments were credible. (*Id.*) As such, Claimant argues that it is difficult to determine whether the ALJ found Claimant to be credible. (*Id.*) Finally, Claimant maintains that the ALJ failed to consider all of her impairments. (*Id.*) Specifically, Claimant argues that the ALJ did not consider her lumbar spine impairment. (*Id.*) Even though the ALJ discussed Claimant's degenerative disc disease of the cervical spine, Claimant asserts that the ALJ failed to discuss the herniated disc at the L5-S1 level and the annular tear at the L4-5 level. (*Id.* at 17). Claimant refers to her testimony at the September 2011 administrative hearing in which she described feeling a "jolt or a shock that goes through [her] spine" in whatever activity she was doing, and that surgery was proposed for her lumbar spine, but she lost her "medical card." (*Id.*)

In response, the Commissioner argues that the ALJ appropriately found that Claimant retained the RFC to perform a range of light work with certain postural and environmental limitations. (ECF No. 13 at 10). According to the Commissioner, the ALJ thoroughly explained Claimant's medical treatment in detail. (*Id.*) The Commissioner asserts that Dr. Wahi's findings actually support the ALJ's determination that Claimant could perform a range of light work. (*Id.* at 11). For example, the Commissioner cites the contrast between Claimant's reports of ongoing numbness in her hands and Dr. Wahi's finding that Claimant could perform fine manipulation with normal grip strength and sensation in her extremities. (*Id.*) Furthermore, the Commissioner asserts that Dr.

Wahi's objective findings were limited as a result of Claimant's lack of cooperation at the examination. Moreover, Dr. Wahi's RFC assessment was inconsistent with his own limited objective findings at the examination. (*Id.* at 11, 13) The Commissioner notes that Dr. Wahi found no way to objectively confirm Claimant's report of severe limitations in sitting and walking. (*Id.* at 11.) As for the ALJ's consideration of Dr. Galang's opinion, the Commissioner insists that the ALJ appropriately rejected the opinion because (1) it was unclear whether Dr. Galang was familiar with the record as a whole; and (2) Dr. Galang's ultimate opinion that Claimant was disabled invaded the province of the Commissioner. (*Id.* at 13-14). As to Claimant's second challenge, the Commissioner responds that the ALJ clearly found that Claimant's impairments could reasonably cause pain and some limitations, but not to the debilitating extent that Claimant described. (*Id.* at 15). Finally, with respect to Claimant's third challenge, the Commissioner contends that most of Claimant's complaints at her appointments related to her neck, not her low back. (*Id.* at 16). In addition, the Commissioner argues that the ALJ adequately considered any lumbar spine impairment by considering the entire record, including the opinions of examining and non-examining physicians who addressed Claimant's alleged lumbar spine impairment. (*Id.* at 16).

In her reply brief, Claimant argues that the Commissioner's *post hoc* rationalization for the ALJ's purported rejection of Dr. Wahi's functional limitations opinion is insufficient to withstand judicial scrutiny. (ECF No. 14 at 2). Claimant reiterates that the ALJ was required to explicitly indicate the weight afforded to Dr. Wahi's opinion and that the ALJ's error in this regard was not harmless. (*Id.* at 2-3). Furthermore, Claimant accuses the Commissioner of ignoring Dr. Galang's statements as to Claimant's functional limitations and focusing solely on Dr. Galang's opinion that

Claimant was unable to work. (*Id.* at 3). With respect to her second challenge, Claimant maintains that the ALJ's credibility statements were inconsistent. (*Id.*) Lastly, as to her final challenge, Claimant asserts that the Commissioner's argument ignores her testimony that she planned to have surgery on her lumbar spine. (*Id.*)

## V.  <u>Relevant Medical History</u>

The undersigned has reviewed the entire record and summarizes the evidence pertinent to Claimant's challenges below.

### A. Treatment Records

On March 18, 2010, Claimant was transported to Boone Memorial Hospital via ambulance after being involved in a motor vehicle collision. (Tr. at 566). Claimant reported that she was hit on the driver's side of her vehicle, where she was seated, and that the driver's side mirror hit her in the head, although she did not lose consciousness. (Tr. at 556, 559). She complained of headache, dizziness, and pain in her chest, abdomen, low back, neck, and left hip. (Tr. at 556, 559). Claimant's past medical history included anxiety, asthma, and chronic pain. (Tr. at 559). Radiological studies of Claimant's chest, abdomen, pelvis, neck, head, hip, and lumbar spine were ordered. (Tr. at 562-64, 570-77). An x-ray of the left hip revealed no acute fracture. (Tr. at 570). An x-ray of the lumbar spine revealed a prior cholecystectomy. (Tr. at 571). Mild degenerative changes in the lumbar spine and minimal retrolisthesis at L5-S1 were also noted; however, no fracture or acute mal-alignment was observed. (*Id.*) A CT scan of Claimant's head showed no acute brain abnormality, but did reveal suspected acute left maxillary sinusitis. (Tr. at 572). A CT scan of Claimant's cervical spine showed no acute fracture or mal-alignment and minimal, if any, spondylosis. (Tr. at 573-74). The cervical spine CT scan did show lateral curvature of the cervical spine with convexity to the right. (Tr. at

574). The CT scans of Claimant's chest, abdomen, and pelvis revealed no acute findings. (Tr. at 575-76). Claimant was diagnosed with multiple contusions and sinusitis. (Tr. at 560). She was discharged in good condition with instructions to follow up with her primary care physician in one week and received prescriptions for Flexeril and Bactrim. (*Id.*)

Claimant returned to Boone Memorial Hospital on April 16, 2010 with complaints of neck and back pain. (Tr. at 534). She indicated that she felt pain with deep breathing. (*Id.*) She also reported that she was out of daily medications and still had not recovered from the after-effects of the motor vehicle accident. (Tr. at 536). Claimant described her pain as an eight out of ten located in the neck and low back, radiating down the left leg. (Tr. at 536). Upon examination, Claimant initially appeared in mild distress, but later was described as in no distress. (Tr. at 534, 536). She was oriented, cooperative, and demonstrated coherent speech. (Tr. at 534). Her treating physician noted some left side numbness, left lower extremity pain, left buttock pain, limited range of motion in the neck, spinous process tenderness, and paraspinous tenderness. (Tr. at 536). Claimant was diagnosed with neck strain/pain and low back pain with radiculopathy to the left leg. (*Id.*) Claimant was referred for MRIs of her cervical and lumbar spine and provided a prescription for Motrin 800 mg and Flexeril. (Tr. at 536-37). Her condition upon discharge was fair. (Tr. at 536).

On May 4, 2010, Claimant underwent an MRI of the cervical and lumbar spine at Boone Memorial Hospital. (Tr. at 584-87). With regard to Claimant's cervical spine, Robert Davis, M.D., found multilevel degenerative disc disease with the greatest neural impingement at C6-7 where there was a moderate sized central right paracentral disc herniation within inferior migration and resulting spinal cord contour deformity. (Tr. at

585). Dr. Davis also noted a disc bulge and the appearance of central spinal canal stenosis at T2-T3. (*Id.*) He found no foraminal stenosis. (*Id.*) As for Claimant's lumbar spine, Dr. Davis found multilevel degenerative disc disease greatest at L5-S1 where there was a central disc herniation with central spinal canal stenosis and otherwise broad based disc bulge with bilateral foraminal stenosis, but without definite nerve root impingement. (Tr. at 587).

On May 7, 2010, Claimant presented to Boone Memorial Hospital with complaints of low back pain after she lifted her child and felt a popping sensation in her back. (Tr. at 599). She reported that, since then, she had been unable to stand up straight. (*Id.*) Upon examination, Claimant did not appear to be in distress, but she reported that her pain level was a nine out of ten. (Tr. at 601). She denied experiencing pain in the cervical spine, thoracic spine, and lower extremities. (*Id.*) Spinous process tenderness and paraspinous tenderness were observed. (*Id.*) Claimant was diagnosed with low back pain and provided prescriptions for Flexeril, Vicodin, and Naproxen. (Tr. at 601). She was discharged in good condition. (*Id.*)

Claimant returned to Boone Memorial Hospital on May 16, 2010, requesting prescription medication for her back pain. (Tr. at 588). Claimant indicated that she was out of her previously prescribed medications. (*Id.*) Upon examination, Claimant appeared to be in mild distress initially, but later was observed to be in no distress. (Tr. at 588, 592). She experienced lumbar pain, but no spinous or paraspinous tenderness. (Tr. at 592). No leg weakness or numbness was noted by the examining physician. (*Id.*) Claimant was diagnosed with low back pain and provided prescriptions for Flexeril, Motrin, and Vicodin. (Tr. at 592-93). She also received a referral to Dr. Iraj Derakhshan. (Tr. at 588). Claimant was discharged in good condition. (Tr. at 592). She returned three

days later complaining of chronic neck pain that radiated into her back. (Tr. at 603). In addition, Claimant reported that she was out of pain medication. (Tr. at 605). The examination was positive for neck pain along with upper and lower back pain. (*Id.*) Claimant was diagnosed with chronic neck pain and provided a prescription for Vicodin. (*Id.*) She was in good condition upon discharge. (*Id.*)

Claimant began treatment with Cliff Hill, D.C., on May 20, 2010 for neck, mid back, and low back pain. (Tr. at 631). Claimant described her neck pain as localized to the neck with constant, sharp pain that appeared to be worsening over time. (*Id.*) She described her mid and low back pain similarly. (Tr. at 632). She also reported that nothing relieved her symptoms. (Tr. at 632). Claimant's medications at that time included Motrin, Naproxen, Flexeril, and Hydrocodone with acetaminophen. (*Id.*) Based upon his examination, Dr. Hill opined that Claimant's injuries involved the fascia, ligaments, and muscles. (Tr. at 634). Dr. Hill diagnosed Claimant with cervical sprain/strain, displacement of cervical disc with myelopathy, thoracic sprain/strain, lumbar sprain/strain, and intervertebral disc disorder with myelopathy at the lumbar region. (*Id.*) Dr. Hill recorded that therapeutic modalities would include cryotherapy, electric stimulation, massage therapy, and ultrasound. (*Id.*) On May 25, 2010, Claimant informed Dr. Hill that she was very sore and could not stand to be touched without having extreme pain. (Tr. at 643). Claimant's range of motion in her back and neck were tested that day using a computerized range of motion system. (Tr. at 641). Claimant's cervical spine, thoracic spine, and lumbar spine flexion, extension, lateral movement, and rotational movement were all less than fifty percent of what would normally be expected, with the exception of Claimant's thoracic right lateral movement, which was sixty percent of normal. (*Id.*) Two days later, Claimant reported to Dr. Hill that standing

14

for an extended period of time, lying on her back, or bending caused her symptoms to worsen. (Tr. at 644). Throughout June 2010, Claimant continued to complain of pain in her neck and back to Dr. Hill, but her tolerance for manipulative therapy generally increased during that month. (Tr. at 646-56).

Claimant presented to Iraj Derakhshan, M.D., on June 23, 2010 after being referred by Jennifer Hensley, M.D. (Tr. at 696). Claimant complained of neck pain that radiated to the low back. (Tr. at 699). Claimant reported experiencing dizziness, trouble sleeping, anxiety attacks, and pain in her muscles, joints, and bones. (Tr. at 700). She indicated that as a result of an automobile accident, she suffered from low back and neck pain along with numbness in her legs and arms, which occurred mostly on her right side. (Tr. at 702). At that time, Claimant stated that the chiropractic treatment had not relieved her symptoms. (Tr. at 702). Dr. Derakhshan observed that Claimant presented with a normal mental state and that she was oriented in all spheres. (Tr. at 696). Claimant demonstrated good insight and normal memory function. (*Id.*) Dr. Derakhshan noted that Claimant's power, bulk, tone, and posture were normal in all extremities with preserved reflexes. (*Id.*) Claimant's sensation, coordination, and gait were unremarkable with the exception of weak grip bilaterally. (*Id.*) Dr. Derakhshan diagnosed Claimant with trauma related carpal tunnel syndrome compression, migraines, and back pain. (*Id.*) He ordered an MRI of Claimant's brain along with a nerve conduction study and prescribed Maxalt, Topamax, and Norco. (*Id.*)

On July 2, 2010, Claimant completed a patient health history form at St. Mary's Neurosurgery. (Tr. at 774-76). She reported neck and low back pain, numbness and tingling in her hands and feet, and headaches, all of which she attributed to the March 2010 automobile accident. (Tr. at 774). Her symptoms also consisted of tiredness,

weakness, lack of energy, sleep issues, headaches, dizziness, double vision, leg pain with walking, and swollen feet, ankles, or legs. (Tr. at 775). David L. Weinsweig, M.D., examined Claimant that day and reported his findings to Dr. Derakhshan by letter. (Tr. at 628-29). Claimant reported experiencing significant pain in the posterior cervical region into the trapezius areas and down the right upper arm, more so than the left arm. (Tr. at 628). She also reported almost constant numbness in her hands, particularly at night. (*Id.*) In addition, Claimant stated that she experienced back pain and pain down her legs laterally to the calves, right worse than left. (*Id.*) She told Dr. Weinsweig that her neck pain was the most bothersome of her symptoms, but she was receiving chiropractic treatment that offered some relief. (*Id.*) Upon physical examination, Claimant appeared overweight and in no acute distress. (*Id.*) Her gait and tandem gait were normal. (*Id.*) Her motor strength in both upper and lower extremities was grossly strong throughout with intact sensation and equal reflexes. (*Id.*) Dr. Weinsweig observed no Hoffman sign, ankle clonus, or evidence of spasticity or myelopathy. (*Id.*) After reviewing the examination findings and MRIs of Claimant's cervical and lumbar spine, Dr. Weinsweig diagnosed Claimant with cervical and lumbar radiculopathy with a suspected element of carpal tunnel syndrome. (Tr. at 628-29). Treatment options were discussed, and Claimant informed Dr. Weinsweig that she wanted to have surgery on her neck. (Tr. at 629). Dr. Weinsweig opined that Claimant would never be "perfect," and recorded that Claimant had "a multiplicity of complaints," which he found to be reasonable given her large disc herniations. (*Id.*)

Claimant continued to treat with Dr. Hill throughout July 2010. On July 6, 2010, Claimant reported worsening neck and back pain. (Tr. at 658). She also noted that the pain she experienced when turning her head had gotten worse. (*Id.*) Her tolerance for

manipulative therapy that day was satisfactory, but she was very sore. (Tr. at 659). On July 13, 2010, Claimant told Dr. Hill that her back and neck continued to be stiff and tender in spots, but she tolerated treatment well. (Tr. at 662-63). Claimant subsequently missed three appointments with Dr. Hill in July 2010. (Tr. at 664-66).

On July 20, 2010, Dr. Derakhshan performed EMG and nerve conduction studies. (Tr. at 704-06, 765-69). The tests revealed normal findings in Claimant's lower extremities; however, in her upper extremities, the tests indicated bilateral carpal tunnel compression, more severe on the left, affecting all digits. (Tr. at 728). Dr. Derakhshan noted that the ulnar and radial controls were normal and that there was no significant delay across the elbow in regard to the ulnar nerves. (*Id.*)

Claimant returned to Dr. Derakhshan on August 25, 2010 with continued complaints of low back pain that radiated to both legs and neck pain. (Tr. at 707). She reported that medication helped to relieve her pain. (*Id.*) Her medication regimen remained in place with an increase in Topamax. (*Id.*)

On September 7, 2010, Dr. Weinsweig wrote a letter, presumably to an insurance company, reporting that he recommended Claimant undergo an anterior cervical discectomy, fusion, bone graft, and plating on two levels. (Tr. at 630).

Throughout September 2010, Claimant continued to treat with Dr. Hill. On September 9, 2010, Claimant complained of pain and stiffness in her neck. (Tr. at 746). On September 30, 2010, Dr. Hill recorded that Claimant's cervical and thoracic spine exhibited tenderness and pain with decreased strength and range of motion. (Tr. at 749). Claimant also received treatment at Hill Chiropractic Center on October 5, 2010. (Tr. at 751-53). She reported that lying prone increased her pain. (Tr. at 752). At that time, her treater noted that she exhibited normal gait and good posture. (Tr. at 751).

Cranial nerve testing was normal. (*Id.*) Claimant's treater further noted that bilateral leg raise tests and leg drop tests were positive on both sides. (Tr. at 752). Strength in both Claimant's upper extremities and lower extremities was 5/5. (Tr. at 751). Claimant's range of motion in her back and neck were again tested that day using a computerized range of motion system. (Tr. at 753). The test results revealed an increase in range of motion spanning from eleven percent to sixty percent of that normally expected in her cervical, thoracic, and lumbar spine. (*Id.*) Claimant's range of motion was still described by her treater as "very low"; however, her treater also indicated that her range of motion had "greatly improved." (Tr. at 751).

Claimant returned to Dr. Derakhshan on February 25, 2011. (Tr. at 713). She reported low back pain that radiated to both legs along with pain and numbness in both arms due to carpal tunnel syndrome. (*Id.*) She also indicated experiencing headaches. (*Id.*) At that time, Claimant's medications included Topamax, Maxalt, and Norco. (*Id.*) Claimant told Dr. Derakhshan that her medications helped relieve her pain. (*Id.*)

On June 14, 2011, Claimant visited Boone Memorial Hospital with complaints of swelling in her hands and feet as well as a headache. (Tr. at 829). Claimant described her headache as mild and reported that it began five days prior. (*Id.*) Claimant's physical examination was essentially normal with the exception of mild edema in Claimant's lower extremities. (Tr. at 830).  Claimant was prescribed hydrochlorothiazide. (*Id.*)

On July 15, 2011, Claimant underwent an MRI of the cervical spine at Boone Memorial Hospital as ordered by Dr. Hill. (Tr. at 760-63). Dr. Davis found that the MRI revealed multilevel degenerative disc disease with herniations at C3-4, C4-5, C5-6, and to the greatest degree, at C6-7, where there appeared central spinal canal stenosis and spinal cord contour deformity. (Tr. at 761). Dr. Davis also noted disc protraction, which

he opined was likely herniation, on the edge of the field of view at T2-T3. (*Id.*)

Claimant completed a patient health history at St. Mary's Neurosurgery on August 10, 2011. (Tr. at 778-81). She reported her symptoms as neck and low back pain, pressure headaches, and migraines. (Tr. at 778). She further indicated experiencing lack of energy, weakness, sleep issues, depression or moodiness, dizziness, and swollen feet, ankles, or legs. (Tr. at 779-80). By letter of same date, Dr. Weinsweig reported to Dr. Derakhshan that Claimant's condition had not changed since his last examination. (Tr. at 785). Claimant continued to report suffering from neck pain into the trapezius areas and down her arms into her hands with numbness and tingling as well as low back pain. (*Id.*) Dr. Weinsweig noted that a prior nerve conduction study revealed the presence of carpal tunnel syndrome. (*Id.*) Claimant indicated that her neck still bothered her, but chiropractic treatments with Dr. Hill did help to relieve her symptoms. (*Id.*) Upon examination, Claimant appeared healthy and in no acute distress. (*Id.*) Dr. Weinsweig's examination of the cervical spine revealed decreased range of motion in all directions; however, no paraspinal muscle spasm, point tenderness, or bony step-offs were observed. (*Id.*) Claimant was oriented with intact memory and followed complex commands easily. (Tr. at 786). Her gait was observed to be normal. (*Id.*) Motor strength in Claimant's upper and lower extremities was normal, and her deep tendon reflexes were 1+/4 throughout her extremities bilaterally. (*Id.*) Straight leg-raising and hip rotation were negative bilaterally. (*Id.*) After reviewing Claimant's July 2011 cervical spine MRI, Dr. Weinsweig recorded that Claimant had disc disease most severely at C6-7, followed by C5-6. (*Id.*) In addition, he observed some central mild protrusion at C4-5 and C3-4 along with mild protrusion at C2-3. (*Id.*) Dr. Weinsweig opined that Claimant suffered from chronic pain with cervical radiculopathy and probable carpal tunnel

syndrome as well as lumbar disc disease. (*Id.*) He also believed Claimant to be under severe stress due to family issues and noted that she was in contact with Prestera. (*Id.*) After a discussion of treatment options, Claimant consented to surgery on her neck. (*Id.*)

Claimant was admitted to St. Mary's Medical Center on August 25, 2011 and examined by Dr. Weinsweig in preparation for surgery. (Tr. at 795-97). Upon examination, Claimant appeared to be in no acute distress. (Tr. at 796). She exhibited a decreased range of motion of her neck in all directions. (*Id.*) Motor strength in her upper and lower extremities was strong, and her reflexes were equal. (*Id.*) She showed no ankle clonus, Hoffman's sign, or Babinski sign. (*Id.*) Although Dr. Weinsweig had concerns as to Claimant's multiple psychosocial issues, which he believed might interfere with Claimant's improvement, he determined that surgery was appropriate due to Claimant's cervical spine condition. (*Id.*) The following day, on August 26, 2011, Claimant underwent complete "radical anterior cervical diskectomies, osteophytectomies, and bilateral foraminotomies, C5-6 and C6-7 under microscope using microsurgical technique for decompression of the thecal sac and nerve roots."[3] (Tr. at 789). In addition, Dr. Weinsweig performed an "anterior cervical arthrodesis, C5-6 and C6-7, utilizing 6 x 11 x 14 mm ASR allograft bone block bone," and an "anterior cervical instrumentation, C5- to C7 utilizing number 40 mm translational Atlantis plate system." (*Id.*) Claimant's postoperative diagnosis was cervical radiculopathy. (*Id.*)

Claimant returned to Dr. Derakhshan on September 16, 2011 complaining of neck pain, headaches, and low back pain. (Tr. at 770). Dr. Derakhshan noted that Claimant had recently undergone surgery on her cervical spine. (*Id.*) Claimant reported that medication did help relieve her pain. (*Id.*)

---

[3] An in-patient registration form completed that day states that Claimant received Medicaid. (Tr. at 794).

On September 28, 2011, Claimant underwent an x-ray of her cervical spine at St. Mary's Medical Center. (Tr. at 788). Rodger Blake, M.D., found no evidence of instability after undergoing surgery. (*Id.*) Dr. Blake observed some improvement since August 26, 2011 with less lucency seen between the upper bone plug at C5-6 and the adjacent vertebra. (*Id.*) Dr. Blake saw no complications from Claimant's recent surgery. (*Id.*)

That same day, Dr. Weinsweig examined Claimant. (Tr. at 782). Dr. Weinsweig noted that it had been approximately one month since he performed an anterior cervical fusion C-5 to C-7. (*Id.*) Claimant informed Dr. Weinsweig that the severe pressure she had experienced was gone; however, she still reported some discomfort in the back of her neck and at the trapezius areas. (*Id.*) Dr. Weinsweig noted that Claimant was able to move her extremities well. (*Id.*) In addition, Dr. Weinsweig recorded that he was pleased with the x-rays taken that day. (*Id.*) He offered Claimant physical therapy, but her insurance would not cover the cost. (*Id.*) Claimant was advised to slowly increase her activities as tolerated and to return in two months. (*Id.*) Dr. Weinsweig opined that Claimant was doing as well as he could expect. (*Id.*)

Claimant returned to Boone Memorial Hospital on May 23, 2012 complaining of neck and upper back pain. (Tr. at 850-53). She reported to the nurse that her neck pain began in 2011, and she had begun to feel a "popping/cracking" sensation in her neck approximately four days prior to her visit. (Tr. at 852). She also felt numbness and tingling in her right arm and hand. (*Id.*) Claimant described her pain as moderate. (Tr. at 853). Claimant stated that she was advised by her surgeon to present to the emergency room. (Tr. at 852). Claimant stated she was out of her medication and did not have an appointment with Dr. Derakhshan until September 2012, indicating that

she had missed an appointment with him in March 2012. (*Id.*) Upon examination, Claimant did not appear to be in distress. (Tr. at 853). She experienced some neck tenderness and trapezius tenderness on the right side. (*Id.*) She also reported tenderness in her upper back on the right side. (*Id.*) Claimant's lower back and extremities were nontender, and she denied experiencing low back pain. (*Id.*) A neurological examination was normal. (*Id.*) Claimant was diagnosed with chronic neck pain and cervical radiculopathy. (*Id.*) She was prescribed Lortab and released in good condition. (*Id.*)

Claimant returned to Boone Memorial Hospital on May 30, 2012 again complaining of moderate neck pain, which radiated down her right arm. (Tr. at 858). Claimant reported that she would not be able to see her pain management doctor until September and that she would not be able to obtain a "medical card" until late summer. (*Id.*) She further indicated that she was out of pain medication. (Tr. at 856). Upon examination, Claimant did not appear to be in distress. (Tr. at 858). Her treater observed tenderness and decreased range of motion in the cervical spine along with mild tenderness in the trapezius and sternocleidomastoid. (*Id.*) Range of motion was also decreased in Claimant's upper back. (*Id.*) A neurological examination was normal. (*Id.*) The treating physician informed Claimant that the doctors at the emergency department could not continue to prescribe narcotic pain medication for her and that she should follow-up with her pain management doctor. (*Id.*) Claimant was diagnosed with chronic neck pain with radiculopathy, and she was discharged in good condition with a prescription for Lortab. (*Id.*)

On January 30, 2013, Claimant visited Dr. Derakhshan. He noted that Claimant's last appointment with him occurred in September 16, 2011. (Tr. at 889). At this visit,

Claimant continued to complain of neck pain, headaches, and low back pain that radiated into both legs. (*Id.*) She also reported numbness in her hands, which Dr. Derakhshan felt might be the result of carpal tunnel syndrome. (*Id.*) He prescribed Imitrex, Norco, and Topamax. (*Id.*)

Claimant underwent an EMG and nerve conduction study performed by Dr. Derakhshan on February 19, 2013. (Tr. at 884-86). On March 18, 2013, Dr. Derakhshan reported that the findings indicated upper extremity bilateral carpal tunnel compression affecting all digits on the left and two digits on the right.[4] (Tr. at 883). Ulnar and radial controls were normal. (*Id.*) Dr. Derakhshan observed no significant delay across the elbow regarding the ulnar nerves. (*Id.*) As for Claimant's lower extremities, Dr. Derakhshan noted that the tibial component of the sciatic nerve on the left side fell below normal, but he could not determine the cause. (*Id.*)

### B. Evaluations and Opinions

On May 26, 2010, Leandro Galang, M.D., evaluated Claimant for the purpose of determining Medicaid eligibility. (Tr. at 624-26). Dr. Galang noted that Claimant's statement of disability included an allegation of a motor vehicle accident causing injury to her neck and low back. (Tr. at 624). He also recorded that Claimant was involved in a four-wheeler accident four years prior to the evaluation. (*Id.*) Upon examination, Claimant's posture, gait, and speech were normal. (*Id.*) Dr. Galang found that Claimant had limited range of motion in her neck and in her back. (Tr. at 625). He further recorded that Claimant experienced tingling in her fingers and paraspinal spasms. (*Id.*) A straight leg raise test was negative. (*Id.*) Dr. Galang listed Claimant's diagnosis as

---

[4] This report postdates the ALJ's March 5, 2013 decision. (Tr. at 24). The Appeals Council incorporated the report into the administrative record. (Tr. at 5).

degenerative disc disease and disc herniation at C6-C7, and degenerative disc disease at L4-L5 and L5-S1, with disc herniation present at L5-S1. (*Id.*) Dr. Galang opined that Claimant would not be able to work full-time in her customary occupation or perform any other full-time work for a period of one year. (*Id.*) He explained that Claimant would need rehabilitation and strengthening for her back. (*Id.*) Dr. Galang recommended that Claimant undergo physical therapy or chiropractic treatment and asserted that she might require an examination by a neurosurgeon. (Tr. at 626). Dr. Galang opined that Claimant was limited in her ability to stand, walk, and sit for prolonged periods of time as a result of her cervical and lumbar strain, disc herniation, and degenerative disc disease. (*Id.*)

Lester Sargent, M.A., performed a Mental Status Examination for the West Virginia Disability Determination Service on November 1, 2010. (Tr. at 674-78). At the time of the examination, Claimant weighed 234 pounds. (Tr. at 674). Claimant presented with a forward slumped posture and slow gait. (*Id.*) She reported that she applied for benefits as she had been involved in a car wreck in March 2010 and had herniated discs in her back and neck, numbness and tingling in her hands and feet, and surgery on her neck. (Tr. at 675). She further indicated that she experienced anxiety attacks and feelings of depression. (*Id.*) Claimant informed Mr. Sargent that she had a history of recurrent and unexpected panic attacks with fear of additional attacks associated with heart palpitations, chest discomfort, fear, trembling, sweating, and problems breathing. (*Id.*) She also outlined a history of sporadic depressive symptoms, including sleep disruption and feelings of helplessness or pessimism about the future. (*Id.*) The main focus of the evaluation was Claimant's chronic neck and back pain. (*Id.*) Claimant asserted that her pain caused disruption in her social, occupational, and other

areas of functioning. (*Id.*) She reported that her pain caused her to feel sad, worrisome, and anxious as well as frustrated over her inability to work and do activities. (*Id.*) She told Mr. Sargent that her family physician has prescribed medication for anxiety control since 2006. (*Id.*)

Mr. Sargent noted that Claimant reported rarely going to the store, running errands, or dining out. (Tr. at 677). Claimant also denied having any hobbies. (*Id.*) Claimant informed Mr. Sargent that she occasionally visited with family members, talked on the telephone daily, and occasionally attended church. (*Id.*) In describing a typical day, Claimant stated that she arose by 7:00 a.m. and was able to perform basic self-care duties without assistance. (Tr. at 678). She readied her daughter for school and afterwards was able to perform household chores, including cooking, doing laundry, washing dishes, and sweeping, with breaks every thirty minutes due to pain. (*Id.*) Claimant watched television for much of the day and rarely went outside. (*Id.*) In the evenings, Claimant helped with dinner, spent time with her daughter, and readied her daughter for bed. (*Id.*) Mr. Sargent diagnosed Claimant with panic disorder, without agoraphobia; pain disorder associated with both psychological factors and general medical condition; and depressive disorder, not otherwise specified. (Tr. at 677). Mr. Sargent found Claimant's prognosis to be fair and opined that she could manage any benefits that she might receive. (Tr. at 678).

On April 11, 2011, James Egnor, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 717-24). Dr. Egnor noted that Claimant's impairments included cervical herniated nucleus pulposus with chronic pain, lumbar herniated nucleus pulposus and strain with chronic pain, and headaches. (Tr. at 717). With respect to exertional limitations, Dr. Egnor opined that Claimant could occasionally lift or carry

twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. at 718). Claimant also retained unlimited ability to push or pull. (*Id.*) As to postural limitations, Dr. Egnor determined that Claimant could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. (Tr. at 719). In relation to manipulative limitations, Claimant was unlimited in her ability to handle and finger; however, she was limited in reaching in all directions, including overhead, and feeling. (Tr. at 720). In support of these limitations, Dr. Egnor cited Claimant's reports of bilateral hand numbness and chronic cervical pain with herniated nucleus pulposus. (*Id.*) Claimant had no visual or communicative limitations. (Tr. at 720-21). As to environmental limitations, Claimant could have unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 721). Dr. Egnor asserted that Claimant should avoid concentrated exposure to extreme cold, vibration, and hazards, such as machinery or heights. (*Id.*) Dr. Egnor recorded that Claimant complained of migraines, loss of feeling in her hands and feet, continuous neck pain, and continuous low back pain, which was made worse by prolonged sitting or standing. (Tr. at 722). In summarizing Claimant's reported activities of daily living, Dr. Egnor indicated that Claimant helped care for her child and for family pets, shopped once per month, visited her parents, folded laundry, and handled money; however, Claimant also reported that she had sleep issues, needed help with personal care and medication reminders, and could not cook, go out alone, walk or sit longer than five to ten minutes, bend, reach, squat, kneel, or climb stairs. (*Id.*) In addition to summarizing Claimant's reported activities of daily living, Dr. Egnor also summarized records from Claimant's treatment with Dr. Hill and at Boone Memorial Hospital along with the

results of Dr. Galang's evaluation. (Tr. at 724). Ultimately, Dr. Egnor opined that Claimant's complaints were not fully credible and that she was limited to light exertional work activity with some postural and environmental limitations. (*Id.*)

On October 16, 2012, Rakesh Wahi, M.D., performed a Consultative Examination for the West Virginia Disability Determination Service. (Tr. at 859-63). Dr. Wahi noted that Claimant alleged neck and back injury, anxiety attacks, deterioration of the low back, and cervical spine injury. (Tr. at 859). Claimant reported being involved in head-on collision with a large truck resulting in loss of consciousness and whiplash. (*Id.*) Due to her injury, Claimant underwent neck fusion; however, after the surgery, she continued to report neck pain in addition to problems with her hands. (*Id.*) She complained of pain and numbness in her hands, significant stiffness in her neck, and problems with her daily activities. (Tr. at 859-60). Nonetheless, Claimant admitted that she could perform fine manipulation with both hands. (Tr. at 860). Claimant informed Dr. Wahi that she could only sit or walk for five to ten minutes and was in constant pain, which Claimant described as ranging from an eight to ten out of ten. (*Id.*) When asked about her hobbies, Claimant reported she took "nature walk[s]." (*Id.*) However, according to Claimant, her pain increased with any significant physical activity. (*Id.*) In addition, Claimant indicated she experienced low back pain after the accident and that this pain was related to problems with her discs. (*Id.*) Claimant further reported suffering from severe migraines occurring once per month that lasted as long as three to four days and occasionally would persist continuously for twenty days. (Tr. at 861). The migraines were relieved with Maxalt, but she could no longer obtain that prescription due to her insurance. (*Id.*) Claimant reported that her current medications included Lortab and Topamax. (*Id.*)

Upon examination, Claimant was fully alert, oriented, and cooperative. (*Id.*) Dr. Wahi described Claimant as "moderately overweight in appearance" and noted that she weighed 244 pounds at that time. (*Id.*) Claimant's affect was normal. (*Id.*) Examination of Claimant's neck did not reveal any masses or carotid bruits. (Tr. at 862). Claimant exhibited grip strength of ten in both hands. (*Id.*) She had normal sensation and normal to slightly increased reflexes in all extremities. (*Id.*) Claimant reported being in severe pain and could not fully show range of motion in her shoulders. (*Id.*) She informed Dr. Wahi that trying to elicit passive assistance would be too painful, and therefore, Dr. Wahi did not attempt it. (*Id.*) The active range of motion in both shoulders was 160 degrees of flexion and abduction and thirty degrees of adduction. (*Id.*) Dr. Wahi observed that internal and external rotation of the shoulders was normal. (*Id.*) Claimant had normal range of motion at both elbows and wrists. (*Id.*) Dr. Wahi recorded that Claimant's hands could be fully extended, she could make fists, and her fingers could be opposed. (*Id.*) Knee range of motion was 120 degrees with Claimant requesting no attempts at passive range of motion. (*Id.*) Hip forward flexion was ninety degrees, hip abduction was thirty degrees, and hip adduction was ten degrees. (*Id.*) Range of motion in Claimant's hips was accompanied by complaints of severe pain. (*Id.*) Dr. Wahi observed some straightening of the cervical spine with lateral flexion at ten degrees, flexion at twenty degrees, extension at thirty degrees, and rotation at twenty degrees bilaterally. (*Id.*) Claimant exhibited severe tenderness over the lumbar spine without spasms. (*Id.*) Dr. Wahi noted that lumbar spine flexion and extension were both thirty degrees. (*Id.*) A straight leg raise test was ninety degrees bilaterally in a sitting position and thirty degrees bilaterally in a supine position. (*Id.*) Lateral flexion of the lumbar spine was fifteen degrees to the right and twenty degrees to the left. (*Id.*) Dr. Wahi

diagnosed Claimant with severe trauma, painful cervical and lumbar spine, painful joints, and obesity. (*Id.*) He stated that Claimant complained of pain in the majority of her joints and was not able to cooperate enough to demonstrate passive range of motion. (*Id.*) He recorded that there was some loss of active range of motion. (*Id.*) In addition, Dr. Wahi indicated that Claimant reported severe dysfunction in that she could only sit for five minutes and walk for five to ten minutes, but Dr. Wahi added that he had no way to objectively confirm those reports. (*Id.*)

Dr. Wahi also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 865-72). He opined that Claimant could occasionally lift or carry up to ten pounds and that she could never carry weight over ten pounds. (Tr. at 865). During an eight-hour workday, Dr. Wahi found that Claimant could sit for a total of four hours, stand for a total of one hour, and walk for a total of one hour. (Tr. at 866). The rest of Claimant's time would be spent lying down. (*Id.*) With regard to manipulative limitations, Dr. Wahi noted that Claimant was right-hand dominant. (Tr. at 867). Dr. Wahi opined that Claimant could frequently reach overhead, reach all other directions, handle, finger, feel, push, and pull. (*Id.*) He found that she could frequently operate foot controls using her right or left foot. (*Id.*) As to postural limitations, Dr. Wahi determined that Claimant could never stoop, kneel, crouch, or crawl; however, she could occasionally balance and climb stairs, ramps, ladders, or scaffolds. (Tr. at 868). With respect to environmental limitations, Dr. Wahi concluded that Claimant could frequently tolerate exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. at 869). Finally, Dr. Wahi indicated that Claimant could perform a variety of activities listed by the form, including shopping,

traveling without assistance, ambulating without the use of an assistive device, walking a block at a reasonable pace on rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace without the use of a single hand rail, preparing simple meals, caring for personal hygiene, and sorting, handling, or using paper or files. (Tr. at 870). Dr. Wahi opined that Claimant's limitations would last for twelve consecutive months. (*Id.*) Throughout the form, Dr. Wahi did not list any clinical findings supporting the limitations he provided where prompted to do so. (Tr. at 865-70).

On October 17, 2012, Kelly Robinson, M.A., performed a Psychological Evaluation. (Tr. at 873-78). Claimant presented with a normal gait and posture with good use of all limbs. (Tr. at 873). Claimant informed Ms. Robinson that she drove to the interview unaccompanied. (*Id.*) Claimant reported suffering from depression, anxiety, and physical issues. (*Id.*) She described experiencing crying spells, diminished interest, feelings of worthlessness and hopelessness, fatigue, loss of appetite, sleep difficulty, problems concentrating, and withdrawal from people. (*Id.*) In addition, Claimant expressed fearful episodes accompanied by chest tightness, breathing issues, shakiness, lack of focus, heart palpitations, dizziness, and sweating. (Tr. at 874). Claimant also reported difficulty sleeping and stated that she obtained only two or three hours of sleep per night. (*Id.*) With regard to her vocational background, Claimant asserted that she last worked in 2009 at a fast food restaurant, but she quit when her "vehicle blew up." (*Id.*)

In describing a typical day, Claimant stated that she went to bed around 3:00 a.m. and arose at 6:00 a.m. to see her daughter off to school. (Tr. at 876). Claimant indicated that she spent much of her time in her bedroom, alternating between sitting

and standing. (*Id.*) Each day, Claimant talked with her parents and daughter, took her medications, used the microwave to heat food, ate, and watched television. (*Id.*) Each week, Claimant would do laundry with her mother, and each month, she would go grocery shopping with her parents. (Tr. at 876-77). Ms. Robinson diagnosed Claimant with major depressive disorder, recurrent, severe without psychotic features and panic disorder without agoraphobia. (Tr. at 876). Ms. Robinson opined that Claimant's prognosis was fair. (Tr. at 877).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

### A. The ALJ's Evaluation of Opinion Evidence

In her first challenge, Claimant contends that the ALJ improperly rejected Dr. Galang's opinion and failed to explicitly discuss Dr. Wahi's opinion as to Claimant's functional limitations. (ECF No. 12 at 11-15). Claimant points out that Dr. Galang opined that she would be unable to work full-time for one year and that she had limitations in standing, walking, and sitting for prolonged periods of time. (*Id.* at 14-15). As for Dr. Wahi, Claimant avers that the ALJ failed to explicitly discuss and weigh the doctor's functional limitations opinion, which restricted Claimant to occasionally lifting a maximum of ten pounds, sitting for four hours, and standing or walking for one hour in an eight-hour workday. (*Id.* at 12).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most

able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.[5] *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. Social Security Ruling ("SSR") 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

---

[5] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin*, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

In discussing Dr. Galang's opinion, the ALJ recognized that Dr. Galang had opined that Claimant would be unable to work full-time for one year.[6] (Tr. at 21). The ALJ assigned no weight to Dr. Galang's opinion for a number of reasons. (*Id.*) First, the ALJ mentioned that Dr. Galang's opinion was provided "for the sole purpose of deciding Medicaid eligibility." (*Id.*) Second, and relatedly, the ALJ asserted that it was unclear whether Dr. Galang was "familiar with the Social Security Administration's disability evaluation program or the evidence of record." (*Id.*) Third, the ALJ found that the

_____

[6] The ALJ referred to Dr. Galang as "Leandro P. Galoas, M.D." in her written decision. (Tr. at 21).

opinion predated Claimant's amended alleged onset date. (*Id.*) Fourth, the ALJ determined that the form completed by Dr. Galang contained "no basis for the conclusions set forth therein." (*Id.*) Finally, the ALJ pointed out that the determination of disability is an issue reserved to the Commissioner. (*Id.*)

To begin, Claimant aptly points out that some of the ALJ's reasons for rejecting Dr. Galang's opinion as to Claimant's ability to work full-time are not supported by the record. First, the ALJ incorrectly found that Dr. Galang's opinion predated Claimant's amended alleged onset date. The ALJ correctly stated in her written decision that Claimant alleged an onset date of August 31, 2009 in her applications for DIB and SSI. (Tr. at 14). Nevertheless, it appears from Claimant's Disability Report that she intended to amend her alleged onset date to coincide with the date of her March 2010 motor vehicle accident. The ALJ did not acknowledge this in her written decision despite referring to an "amended alleged onset date." Regardless, the ALJ incorrectly concluded that Dr. Galang's May 2010 opinion predated the alleged onset date, no matter which date the ALJ had in mind. (Tr. at 333, 626). Second, the ALJ erroneously determined that Dr. Galang's report contained no basis for his opinion. Although Dr. Galang's report of findings after examining Claimant was not extensive, Dr. Galang did find limited range of motion in Claimant's neck and back, and paraspinal spasm in Claimant's back. (Tr. at 625). In addition, Dr. Galang recorded that Claimant suffered from degenerative disc disease of the cervical and lumbar spine, and disc herniation in both the cervical and lumbar spine. (*Id.*) To say that Dr. Galang's report was devoid of findings supporting his opinion is simply incorrect. On the other hand, the ALJ did appropriately recognize that Dr. Galang's opinion as to Claimant's ability to work fell within the province of the Commissioner and that it was unclear as to whether Dr. Galang had

reviewed Claimant's complete medical record.[7]

Most importantly, however, the ALJ neglected to consider Dr. Galang's opinion that Claimant was limited in her abilities to stand, walk, or sit for prolonged periods of time as a result of her cervical and lumbar strain, degenerative disc disease, and disc herniation. (Tr. at 626). The ALJ entirely focused her attention on Dr. Galang's opinion that Claimant was unable to work full-time and failed to mention Dr. Galang's functional limitations opinion. Even though a "prolonged period" was not explicitly defined by Dr. Galang, his RFC assessment arguably conflicts with the ALJ's RFC finding that Claimant can perform light work, which requires "a good deal of walking or standing," and "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251 at *6. Indeed, the ALJ did not reduce the range of light work that Claimant could perform to account for exertional limitations; instead, she only addressed Claimant's additional nonexertional limitations. Given the apparent incompatibility of Dr. Galang's RFC assessment with the ALJ's ultimate RFC finding, the ALJ should have explained why that portion of Dr. Galang's opinion was rejected. SSR 96-8p, 1996 WL 374184, at *7; *Adams v. Colvin*, No. 3:13-4896, 2014 WL 2893195, at *9 (S.D.W.Va. June 26, 2014).

Turning to Dr. Wahi's functional limitations opinion, the undersigned agrees with Claimant that the ALJ failed to discuss Dr. Wahi's opinion in her written decision.

---

[7] Claimant also argues that the standard for determining Medicaid eligibility in West Virginia is identical to the SSA's standard for determining SSI eligibility. (ECF No. 12 at 14). In support of her position, Claimant cites 42 C.F.R. § 435.540(a) and Section 12.2 of the West Virginia Income Maintenance Manual, which states that "[t]he definition of disability for Medicaid purposes is the same as the definitions used by the SSA in determining eligibility for SSI or RSDI [Retirement, Survivors, Disability Insurance] based on disability." (ECF No. 12 at 14; ECF No. 12-1 at 1). Consequently, Claimant criticizes the ALJ's discounting of Dr. Galang's opinion on the basis that his evaluation was performed for the purpose of determining Medicaid eligibility.

The ALJ did explicitly summarize some of Dr. Wahi's examination findings and cite those findings in her credibility analysis, but the ALJ failed to address Dr. Wahi's RFC assessment set forth in the Medical Source Statement of Ability to do Work-Related Activities (Physical) form that he completed after examining Claimant.[8] (Tr. at 20). As stated above, Dr. Wahi opined that Claimant would be restricted to occasionally (up to one-third of the workday) lifting and carrying ten pounds, and never carrying any object weighing more than ten pounds. (Tr. at 865). In addition, Dr. Wahi concluded that Claimant could sit a total of four hours, stand a total of one hour, and walk a total of one hour in an eight-hour workday. (Tr. at 866). Dr. Wahi's opinions are clearly contrary to the ALJ's RFC finding that Claimant can perform work at the light exertional level with only nonexertional limitations. More specifically, light work requires the "frequent lifting or carrying of objects weighing up to 10 pounds," and frequent is defined as "from one-third to two-thirds of the time." 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251 at *5-*6. In addition, light work requires the ability to lift up to twenty pounds at one time. 20 C.F.R. §§ 404.1567(b), 416.967(b). Accordingly, Dr. Wahi's opinion that Claimant is only *occasionally* able to lift and carry objects weighing up to ten pounds is at odds with the regulatory definition of light work. Moreover, as previously mentioned, being able to perform a full range of light work requires standing or walking for approximately six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251 at *6. Obviously, Dr. Wahi's determination that Claimant can only stand or walk for a total of one hour in an eight-hour workday is incompatible with this requirement. Accordingly, as with Dr. Galang's functional limitations opinion, the ALJ should have

---

[8] In considering Dr. Egnor's opinion, the ALJ also mentioned Dr. Wahi's findings with respect to Claimant's extremity strength and sensation. (Tr. at 21).

articulated why she declined to adopt Dr. Wahi's functional limitations opinion. SSR 96-8p, 1996 WL 374184, at *7. Instead, the ALJ neglected to even summarize Dr. Wahi's opinion, and she certainly did not resolve any conflict between Dr. Wahi's functional limitations opinion and her RFC finding. The Court cannot determine whether the ALJ's written decision is supported by substantial evidence when the ALJ fails to reconcile a medical source opinion that directly conflicts with the ALJ's RFC finding. To Be sure, the Court cannot be certain the ALJ truly appreciated or considered the opinion. The ALJ's error is particularly puzzling when considering that she continued the administrative hearing specifically to obtain the updated physical consultative examination that was performed by Dr. Wahi. (Tr. at 77).

To the extent that the Commissioner asserts that Dr. Wahi's opinion was inconsistent with his own examination findings and inconsistent with the record as a whole, (ECF No. 13 at 12-13), her *post hoc* rationale cannot suffice to excuse the ALJ's significant omission. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Buckheister v. Astrue*, No. 4:10-2450-TER, 2012 WL 786355, at *8 (D.S.C. Mar. 9, 2012) (rejecting Commissioner's argument on grounds that it constituted post hoc rationale for ALJ's decision). This is not a case where the ALJ plainly considered the opinion, clearly rejected it, and provided only a summary explanation of the evidentiary bases for the rejection. To the contrary, here it appears just as likely that the ALJ unintentionally overlooked the RFC assessment, as intentionally rejected it. Furthermore, some of Dr. Wahi's examination findings do, in fact, support his opinion, including his observation that Claimant suffered from loss of range of motion in her spine and severe lumbar

spine tenderness. (Tr. at 862). Although some of the details contained in Dr. Wahi's report may potentially undermine his RFC assessment (e.g. Claimant's report that her hobby was going for "nature walk[s]"), the ALJ is tasked with resolving that conflict, *not* this Court, *and not* based on the Commissioner's newly minted rationale.

Finally, the undersigned rejects the Commissioner's position that any error in the ALJ's consideration of the opinion evidence was harmless. (ECF No. 13 at 12-13 n.4). As explicated in some detail below, the opinions of Dr. Galang and Dr. Wahi took into account Claimant's lumbar spine impairment; other than discussing Dr. Egnor's April 2011 opinion, the ALJ's RFC finding did not consider Claimant's lumbar spine limitations. Furthermore, the ALJ's misstep in this case is especially egregious when considering that the RFC assessments provided by the only two examining physicians were never discussed. In addition, as Claimant points out, the vocational expert testified at the administrative hearing that a person with the functional limitations assigned by Dr. Wahi would be unable to perform jobs that exist in significant numbers in the national economy. (Tr. at 48).

Ultimately, the undersigned cannot meaningfully review the ALJ's assessment of the medical source statements. The undersigned thus **FINDS** that the ALJ erred in failing to articulate why she did not adopt the RFC assessments, which conflicted with her RFC finding. Therefore, this case should be remanded pursuant to sentence four of 42 U.S.C. § 405(g).

### B. The ALJ's Consideration of Claimant's Lumbar Spine

Addressing Claimant's final two challenges out of order, Claimant asserts in her next challenge that the ALJ failed to consider her lumbar spine impairment. (ECF No. 12 at 16). Claimant contends that the ALJ neglected to discuss her herniated disc at L5-

S1 and the annular tear at L4-5. (*Id.* at 16-17). Claimant also stresses that a nerve conduction study in February 2013 resulted in below normal readings for her sciatic nerve. (*Id.* at 17). In addition, Claimant cites her testimony at the administrative hearing in which she stated that surgery was proposed for her lumbar spine, but she lost her "medical card." (*Id.*) Without considering her lumbar spine impairment, Claimant maintains that the ALJ "failed to consider the combined effect of her impairments on her ability to do work." (*Id.*)

The Fourth Circuit stated in *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989), that "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." The Social Security Regulations provide that:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must

40

be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Having reviewed the ALJ's written decision, the undersigned finds that the ALJ failed to discuss any medical evidence related to Claimant's alleged lumbar spine impairment. Claimant consistently reported experiencing low back pain in the months following her motor vehicle accident. (Tr. at 534, 536, 559, 588, 599, 631-32, 699, 707, 774). In March 2010, an x-ray of Claimant's lumbar spine revealed mild degenerative changes and minimal retrolisthesis at L5-S1. (Tr. at 571). In May 2010, an MRI of Claimant's lumbar spine showed multilevel degenerative disc disease, a central disc herniation with central spinal canal stenosis at L5-S1, and otherwise broad based disc bulge with bilateral foraminal stenosis. (Tr. a 587). That same month, Claimant was diagnosed by Dr. Hill with lumbar sprain and strain as well as intervertebral disc disorder with myelopathy in the lumbar region, and Dr. Galang observed that Claimant had limited range of motion in her back and paraspinal spasm. (Tr. at 625, 634). Dr. Galang further noted that Claimant suffered from degenerative disc disease and disc herniation in her lumbar spine. (Tr. at 625). In July 2010, Dr. Weinsweig found that Claimant had central and left-sided disc herniation at L5-S1. (Tr. at 628). He diagnosed Claimant with lumbar radiculopathy. (Tr. at 629). In October 2010, after months of chiropractic care, Claimant's lumbar spine range of motion was measured to be approximately fifty percent of what was normally to be expected. (Tr. at 753). Claimant's complaints of low back pain then continued throughout 2011. (Tr. at 713, 770, 778). In August 2011, Dr. Weinsweig diagnosed Claimant with lumbar disc disease. (Tr. at 786). Claimant also reported experiencing low back pain in October 2012 and January 2013. (Tr. at 860, 889). In addition, Dr. Wahi noted in October 2012 that Claimant's lumbar spine was severely tender, and he diagnosed Claimant with a painful lumbar spine. (Tr.

at 862). At the administrative hearing in September 2012, Claimant testified that she was "supposed" to have surgery on her back, but she lost her insurance. (Tr. at 64). Clearly, there is objective medical evidence that Claimant suffers from a lumbar spine impairment. However, the ALJ discussed none of it. The ALJ was required to consider the impact of Claimant's lumbar spine condition on her ability to work, but failed to do so. *See Cox v. Colvin*, No. 4:13-cv-1979-TER, 2014 WL 4656385, at *12-*16 (D.S.C. Sept. 17, 2014) (remanding based, in part, on ALJ's failure to consider claimant's degenerative disc disease of lumbar spine where claimant testified that he experienced severe back pain and MRI of lumbar spine revealed mild degenerative disc disease and facet arthropathy). In fact, the only time that the term "lumbar spine" appears in the ALJ's written decision is in the ALJ's quotation of Listing 1.04's language, which, contrary to the Commissioner's argument, is less than sufficient proof to establish that the ALJ considered Claimant's lumbar spine condition at other steps in the sequential evaluation process. (Tr. at 17).

To the extent that the Commissioner argues the ALJ adequately considered any lumbar spine impairment by summarizing Dr. Wahi's findings and assigning great weight to Dr. Egnor's opinion, that argument is unconvincing. (ECF No. 13 at 16). First, the ALJ neglected to mention Dr. Wahi's finding of severe lumbar spine tenderness and Dr. Wahi's conclusion that Claimant experienced loss of range of motion. (Tr. at 862). Second, the ALJ failed to explicitly discuss any of the evidence summarized above and resolve any conflict between that evidence and Dr. Egnor's opinion as to Claimant's limitations. Third, the ALJ failed to reconcile the opinions of examining physicians Dr. Galang and Dr. Wahi, who clearly considered any limitations caused by Claimant's lumbar spine, with non-examining physician Dr. Egnor's opinion as to Claimant's

42

functional limitations.

Finally, the Commissioner contends that Claimant's challenge related to her lumbar spine must fail because she has not identified any specific additional physical restrictions that should have been included in the ALJ's RFC finding. (ECF No. 13 at 16). In her reply brief, Claimant argues that the additional physical restrictions are contained in the opinion of Dr. Wahi, who addressed Claimant's lumbar spine impairment. (ECF No. 14 at 2 n.1). The undersigned finds Claimant's position to be convincing. Dr. Wahi certainly could have relied on Claimant's lumbar spine impairment in forming his opinion as to Claimant's restrictions in standing and walking. Moreover, Dr. Galang opined that Claimant could not sit, stand, or walk for prolonged periods of time based, in part, on her *lumbar spine* impairment. (Tr. at 626). Furthermore, Claimant maintains throughout her opening brief that the ALJ failed to appropriately consider the medical opinion evidence as to her ability to walk or stand in an eight-hour workday; undoubtedly, Claimant's argument encompasses a position that her lumbar spine impairment causes her more functional limitations in standing or walking than the ALJ found.

Accordingly, the undersigned **FINDS** that the ALJ failed to adequately consider Claimant's lumbar spine condition. Therefore, on remand, the ALJ should address whether Claimant's lumbar spine condition constitutes a severe impairment and whether any lumbar spine condition experienced by Claimant affects her ability to engage in substantial gainful activity, when considered in combination with Claimant's other impairments. *See* 20 C.F.R. §§ 404.1523, 416.923 (requiring that combination of impairments and combined impact of impairments be considered "throughout the disability determination process").

43

### C. The ALJ's Credibility Analysis

Finally, Claimant argues that the ALJ's written decision contained inconsistent findings related to Claimant's credibility. (ECF No. 12 at 16). Specifically, Claimant compares the ALJ's finding that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, (Tr. at 19), with the ALJ's later declaration that Claimant's complaints regarding her impairments were credible, but Claimant did not suffer any impairment or combination of impairments that would prohibit all work, (Tr. at 22).

Although Claimant identifies what appears to be a discrepancy in the ALJ's written decision, having reviewed the decision, the undersigned finds that the ALJ undoubtedly found Claimant to be less than fully credible. For example, the ALJ twice mentioned her belief that Claimant overstated her symptoms in order to obtain benefits. (Tr. at 19, 20). Moreover, the ALJ also rejected the "severe pain and other limitations" that Claimant had alleged. (Tr. at 19). Additionally, the ALJ criticized Claimant's failure to seek treatment and noted that Claimant's statement that her symptoms had not improved was questionable in light of her lack of treatment. (Tr. at 19-20). The ALJ also found that Claimant's reports regarding her activities of daily living were "inconsistent" and that her alleged limitations in activities of daily living were not fully credible. (Tr. at 20). Finally, the ALJ stated that Dr. Wahi's findings belied Claimant's credibility to some extent. (*Id.*) Overall, it is apparent from the ALJ's written decision that she did not find Claimant to be fully credible.

Notwithstanding, the undersigned **FINDS** that, on remand, the ALJ should reconsider Claimant's credibility in light of the medical opinion evidence discussed in this PF & R and the evidence of Claimant's lumbar spine condition. *See* 20 C.F.R. §§

404.1529(c)(1)-(2), 416.929(c)(1)-(2) (providing that, in evaluating claimant's credibility, ALJ must consider medical opinion evidence and objective medical evidence).

## VIII. **<u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court

of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 7, 2015

Cheryl A. Eifert
United States Magistrate Judge